# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**ANTHONY MAMMANA**
5143 Garfield Ave,
Whitehall, PA 18052

        Plaintiff,

        v.

**LIEUTENANT BARBEN**
Rt 15, 2 Miles N of Allenwood
Allenwood, PA 17810

    And

**JOHN DOE(S) (1-10)**

        Defendants.

No. 4: 17-CV-0645

JURY TRIAL DEMANDED

## SECOND AMENDED
## CIVIL ACTION COMPLAINT

**I.   JURISDICTION & VENUE**

1. Jurisdiction in this Honorable Court is based on a violation of federal law conferred by 28 U.S.C. §1331.

2. Venue lies in this district in that the events giving rise to this claim occurred within this district and Defendant, Lieutenant Barben resides, maintains a principal place of business, and/or does business within this district.

**II.   PARTIES**

3. Plaintiff, Anthony Mammana, is an adult individual, currently residing at the above-captioned address.

4. Defendant, Lieutenant Barben, is adult individual who, at all times material herein, acted

individually, as well as in his individual capacity as a corrections officer at Allenwood Low Federal Correctional Institution acting under color of State law.

### III. OPERATIVE FACTS

**BACKGROUND**

5. In 2010, Plaintiff began serving a seven (7) year prison sentence.

6. Plaintiff was transferred to Allenwood Low Federal Correctional Institution in 2012.

7. In or around June 2015, Plaintiff began experiencing a feeling of extreme illness after each meal.

8. On or about June 29, 2015, Plaintiff went to the medical ward. There, non-party, Physician Assistant Weber checked Plaintiff's blood sugar level. However, Physician Assistant Weber needed additional data and told Plaintiff to return the following day after eating.

9. Physician Assistant Weber was on vacation thereafter.

10. On June 30, 2015, the following day, Plaintiff, pursuant to Physician Assistant Weber's direction, returned to the medical ward; Plaintiff was again feeling ill after eating a meal.

11. On June 30, 2015, Plaintiff's blood sugar was again tested and Plaintiff was advised to return to the medical ward as his symptoms flared up.

12. Plaintiff continued to become ill after eating meals and visited the medical ward several more times over the following few days. Each time, Plaintiff was advised to return to the medical ward as his symptoms flared up.

13. On or about his fifth or sixth visit, non-party, Physician Assistant Stoltz suggested that the Plaintiff may be experiencing some type of psychological distress and suggested he see the facility's psychologist, i.e. non-party, Psychologist Bruno.

14. On or about July 6, 2015, upon being examined by non-party, Psychologist Bruno in the

Psychology facility, Psychologist Bruno could not conclude that there was a psychological reason for Plaintiff's pain.

15. On or about July 6, 2015, Non-Party, Psychologist Bruno called the medical ward and advised them that she would be sending Plaintiff back to the medical ward for additional diagnosis and treatment.

16. However, Non-Party, Medical Assistant Taylor, who received Non-Party, Psychologist Bruno's phone call, told Non-Party, Psychologist Bruno that she did not want Plaintiff to come back. In fact, Non-Party, Medical Assistant Taylor told Non-Party, Psychologist Bruno that if Non-Party, Psychologist Bruno sent Plaintiff back to the medical ward, she would refuse to allow Plaintiff entrance.

17. As Plaintiff had never been examined by Non-Party, Medical Assistant Taylor during any of his previous visits to the medical ward, Non-Party, Medical Assistant Taylor had no reasonable or logical basis to refuse Plaintiff entrance to the medical ward, particularly when referred there by Non-Party, Psychologist Bruno.

18. Non-Party, Medical Assistant Taylor argued with Non-Party, Psychologist Bruno over the telephone for several minutes concerning Plaintiff's return to the medical ward.

19. As a result, Non-Party, Psychologist Bruno and a correctional officer personally escorted Plaintiff to the medical ward and advised Non-Party, Medical Assistant Taylor that she must allow the Plaintiff to re-enter the ward and provide Plaintiff treatment.

20. Non-Party, Medical Assistant Taylor was visibly angered by the situation and told Non-Party, Psychologist Bruno that upon confirming that Plaintiff's blood pressure was fine, she would send Plaintiff to the "hole," i.e. administrative segregation.

21. Non-Party, Medical Assistant Taylor then confirmed Plaintiff's blood pressure and filed a

false report, falsely accusing Plaintiff of harassment, stalking, and interference with the performance of duties.

22. Upon Non-Party, Medical Assistant Taylor's false report, Plaintiff was transferred to the "hole" and was place in a cell with another inmate.

## UNDERLYING INCIDENT

23. On or about the following day, on or about July 7, 2015, Plaintiff was transferred to a different administrative segregation cell. Upon being moved and seeing the inmate that Plaintiff was to be placed with, Plaintiff refused. *See* Exhibit A.

24. The new inmate was well-known for his deviate sexual behavior forced onto cellmates.

25. Upon Plaintiff's refusal, Defendant, Lieutenant Barben was notified. *See* Exhibit A.

26. Defendant, Lieutenant Barben directed Plaintiff be placed in a special cell, Z04-002, also known as the "Yellow Room". *See* Exhibit A.

27. The "Yellow Room" is a notorious room known to the inmates at Allenwood Low Federal Correctional Institution for its condition, specifically, the room has bright, yellow walls that intensifies the light therein and is kept at a cold temperature. It also contains an extremely thin mattress on a metal bed frame.

28. Defendant, Lieutenant Barben directed that Plaintiff be provided the "Yellow Room" treatment.

29. As a result, Plaintiff was forced to remove his prison-issued clothing and wear only a paper-weight clothing which was see-through thin; Plaintiff was not be given any blankets or sheets; the bright lights in the "Yellow Room" be kept on twenty-four hours a day, upon information and belief, to deprive Plaintiff of sleep in an effort to punish Plaintiff for his disobedience.

30. Plaintiff was forced to stay in the "Yellow Room" for four (4) days.

31. During the four (4) days in the "Yellow Room", Plaintiff was deprived of warmth due to, *inter alia*,: (a) lack of appropriate clothing; (b) lack of any sheets or blankets; and, (c) the temperature in the "Yellow Room" being incredibly cold; and (d) the thin-mattress against a cold, hard mental bed frame without a pillow.

32. During the four (4) days in the "Yellow Room", Plaintiff was deprived of sleep due to (a) the aforementioned deprivation of warmth; (b) the constantly lit, bright lights in conjunction with the bright yellow walls;

33. During the four (4) days in the "Yellow Room", Plaintiff barely slept. During the few, short instances of sleep, Plaintiff woke up shivering.

34. During the four (4) days in the "Yellow Room", Plaintiff was not provided any sheets, blankets, pillows, wash cloth, towel, toothpaste, toothbrush, or toilet paper.

35. Plaintiff was locked in the yellow room for approximately four full days, without being released from isolation; Plaintiff was not provided an hour out of the yellow room each day.

36. During the four (4) days in the "Yellow Room", Plaintiff was deprived of exercise due to, *inter alia,* being kept locked in the "Yellow Room" for four straight days.

37. Additionally, Plaintiff was provided three meals each day, however, Plaintiff was only provided the food for about twenty minutes. On most occasions, the correctional guards, Defendants, John Does 1-10, took Plaintiff's food plate back before Plaintiff was able to finish eating, depriving Plaintiff of hundreds of calories during each meal.

38. On numerous occasions during each shift, correctional guards, Defendants, John Does 1-10, would come to the window, tapping their stick against it, asking if Plaintiff was "ready to tap out."

39. During the four (4) days in the "Yellow Room", Plaintiff continued to feel sick and requested medical attention, which was refused.

40. The foregoing deprivation of warmth, sleep, and exercise constitute cruel and unusual punishment.

41. After four (4) days in the "Yellow Room", Plaintiff was transferred back to the "hole", i.e. administrative segregation.

**RESULTING EVENTS**

42. On or about July 23, 2015, a Discipline Hearing was held, during which it was determined that Plaintiff had not violated any policies and the Hearing Officer "expunged the charged acts". *See* Exhibit B.

43. Despite finding that Plaintiff had not violated any policies, Plaintiff was placed under internal investigation for a threat assessment. As a result, Plaintiff was unable to return to general population. *See* Exhibit C.

44. Plaintiff was further informed that unknown correctional officials wanted Plaintiff transferred from the Allenwood Low Federal Correctional Institution.

45. As a result, Plaintiff was kept in the "hole" for an additional four months, until Plaintiff was transferred out of Allenwood Low Federal Correctional Institution in or around October 2015.

## IV. COUNTS OF ACTION

### COUNT I
**Cruel & Unusual Punishment**
*Plaintiff v. Lieutenant Barben & John Does, 1-10*

46. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

47. Defendant, Lieutenant Barben knowingly and intentionally placed Plaintiff in the Yellow Room.

48. At the time Plaintiff was placed in the Yellow Room, Plaintiff had not committed any infraction to justify the cruel and unusual treatment he received at the direction of Defendant, Lieutenant Barben and Defendants, John Does 1-10.

49. Plaintiff was forced, under the color of state law, to stay in the Yellow Room, without any leave, for four (4) days.

50. During the four (4) days in the "Yellow Room", Plaintiff was deprived of warmth due to, *inter alia*,: (a) lack of appropriate clothing; (b) lack of any sheets or blankets; and, (c) the temperature in the "Yellow Room" being incredibly cold; and (d) the thin-mattress against a cold, hard mental bed frame.

51. There was no legitimate penological justification for (a) removing Plaintiff's prison-issued clothing and requiring Plaintiff to wear paper-weight clothing instead; (b) refusing to provide Plaintiff with sheets and/or blankets; (c) keeping the temperature in the "Yellow Room" incredibly cold; and, (d) issuing an unusually thin-mattress. There was no legitimate penological justification for depriving Plaintiff of warmth.

52. During the four (4) days in the "Yellow Room", Plaintiff was deprived of sleep due to (a) the aforementioned deprivation of warmth; and, (b) the constantly lit, bright lights in conjunction

with the bright yellow walls.

53. There was no legitimate penological justification for (a) keeping the bright lights in Plaintiff's cell on for twenty-fours a day; and, (b) for the bright yellow walls. There was no legitimate penological justification for depriving Plaintiff of sleep.

54. The foregoing deprivation of warmth and sleep constitute cruel and unusual punishment.

55. Further, there was no legitimate penological justification for refusing Plaintiff toilet paper, which, when taken in conjunction with the foregoing deprivation of warmth and sleep, constitutes cruel and unusual punishment.

56. Plaintiff was locked in the yellow room for approximately four full days, without being released from isolation; Plaintiff was not provided an hour out of the yellow room each day.

57. There was no legitimate penological justification for refusing Plaintiff exercise, which, when taken in conjunction with the foregoing deprivation of warmth and sleep, constitutes cruel and unusual punishment.

58. Plaintiff was provided three meals each day, however, Plaintiff was only provided the food for about twenty minutes. On most occasions, the correctional guards, Defendants, John Does 1-10, took Plaintiff's food plate back before Plaintiff was able to finish eating, depriving Plaintiff of hundreds of calories during each meal.

59. There was no legitimate penological justification for removing Plaintiff's food plate before Plaintiff was able to finish eating.

60. On numerous occasions during each shift, correctional guards, Defendants, John Does 1-10, would come to the window, tapping their stick against it, asking if Plaintiff was "ready to tap out."

61. There was no legitimate penological justification for psychologically toying with

Plaintiff.

62. Further, there was no legitimate penological justification for refusing Plaintiff a pillow, wash cloth, towel, toothpaste, or toothbrush.

63. Defendants showed deliberate indifference to Plaintiff's needs for warmth, sleep, exercise, and food, which constitutes serious, wanton, and reckless disregard for Plaintiff; Plaintiff's needs; and Plaintiff's Constitutional rights.

64. Defendants' actions stated above, *inter alia*, were committed under color of state law and were violations of Plaintiff's clearly establish and well-settled Constitutional and other legal rights.

65. Defendants caused Plaintiff to suffer cruel and unusual punishment in violation of the United States Constitution, actionable through 42 U.S.C. §1983, et seq.

**V. PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court enter judgment in his favor and against Defendant, Lieutenant Barben and John Does 1-10, individually, jointly and separately, in an amount in excess of $75,000, plus such other and further relief as this Honorable Court deems necessary and just, and to Order the following relief including:

   a. Statutory damages;
   b. Punitive damages;
   c. Compensatory damages, including;
      i. Actual damages for financial and physical injuries, and emotional distress; and,
   d. Attorneys' fees and expenses, costs of suit, and equitable relief

Respectfully Submitted,

| | |
|---|---|
| **WEISBERG LAW** | **SCHAFKOPF LAW, LLC** |
| | |
| _/s/ Matthew B. Weisberg_ | _/s/ Gary Schafkopf_ |
| Matthew B. Weisberg | Gary Schafkopf |
| Attorney Id. No. 85570 | Attorney ID No. 83362 |
| L. Anthony DiJiacomo, III | 11 Bala Ave |
| Attorney Id. No.: 321356 | Bala Cynwyd, PA 19004 |
| 7 South Morton Ave. | 610-664-5200 Ext 104 |
| Morton, PA 19070 | Fax: 888-283-1334 |
| 610-690-0801 | |
| Fax: 610-690-0880 | *Attorneys for Plaintiff* |

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTHONY MAMMANA** | : | |
| | : | |
| v. | : | No. 4: 17-CV-0645 |
| | : | |
| **LIEUTENANT BARBEN**, et al. | : | |

# CERTIFICATE OF SERVICE

I, L. Anthony DiJiacomo, III, Esquire, hereby certify that on this 31st day of October 2019, a true and correct copy of the foregoing Second Amended Complaint was served via e-filing upon all counsel of record.

**WEISBERG LAW**

*/s/ L. Anthony DiJiacomo, III*
Matthew B. Weisberg, Esquire
L. Anthony DiJiacomo, III
*Attorneys for Plaintiff*